Document 1

Document 2

Document 3

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

NOTICE OF JUDGMENT
March 24, 2006

TO:      Fernando Groene, Esq.
Michael James Elston, Esq.
Thomas Ernest Booth, Esq.
Gerald Thomas Zerkin, Esq.
Amy Leigh Austin, Esq.
Jeffrey Lance Stredler, Esq.

Judgment was entered this date in Case Number(s):   05-10
05-11

The Court's decision is enclosed.

PETITION FOR REHEARING (FRAP 40)
PETITION FOR REHEARING EN BANC (FRAP 35)

Filing
Time

A petition must be received in the clerk's office within 14 days after judgment to be timely. There are three exceptions to this rule:

(1)  In all civil cases in which the United States or an agency or officer thereof is a party, any petition for rehearing must be received in the clerk's office within 45 days after entry of judgment.

(2)  The Court may grant an extension of time or leave to file a petition for rehearing out of time if the party establishes that the delay resulted from the death or serious illness of counsel or a family member (or of a party or family member in pro se cases) or other circumstances wholly beyond the control of counsel or a party proceeding without counsel.

(3)  Prisoner petitions are deemed filed when delivered to prison authorities.

If a petition for rehearing en banc is to be filed, it must be filed at the same time and in the same document as the petition for rehearing and must be clearly identified in the title.

Each case number to which the petition applies must be listed on the petition, even in companion or consolidated cases. Failure to list the individual case numbers on the petition will result in the unidentified cases proceeding to mandate even if a timely petition for rehearing has been filed in a companion or consolidated case.

A timely filed petition for rehearing or petition for rehearing en banc will stay the mandate and toll the running of time for filing a petition for writ of certiorari.

Purpose

A petition should only be made to direct the Court's attention to one or more of the following situations:

1. A material fact or law overlooked in the decision.
2. A change in the law which occurred after the case was submitted

and which was overlooked by the panel.
3. The opinion is in conflict with a decision of the United States Supreme Court, this Court, or another court of appeals, and the conflict is not addressed in the opinion.
4. The proceeding involves one or more questions of exceptional importance.

Statement of Counsel    A petition shall contain an introduction stating that, in counsel's judgment, one or more of the situations exist as described in the above "Purpose" section.  The points to be raised shall be succinctly listed in the statement.

Form    The 15 page limit allowed by the Rule shall be observed.  The Court requires 4 copies of the petition (20 copies of a petition for rehearing en banc), and a copy of the Court's opinion must be attached to each copy of the petition.

## BILL OF COSTS (FRAP 39)

Filing Time    A party to whom costs are allowed, who desires taxation of costs, shall file a bill of costs on or before 04/07/06.

## MANDATE (FRAP 41)

Issuance Time    In original proceedings before this Court, there is no mandate. Unless the Court shortens or extends the time, in all other cases, the mandate issues 7 calendar days after the expiration of the time for filing a petition for rehearing.  A timely petition for rehearing, petition for rehearing en banc, or motion to stay the mandate will stay the issuance.  If the petition or motion is denied, the mandate will issue 7 calendar days later. If a stay of mandate is sought, only the original of a motion need be filed.

Stay    A motion for stay of the issuance of the mandate shall not be granted simply upon request.  Ordinarily the motion will be denied unless it would not be frivolous or filed merely for delay and would present a substantial question or otherwise set forth good or probable cause for a stay.

## CRIMINAL CASES (Plan in Implementation of the CJA)

Criminal    In criminal cases, counsel must inform the defendant in writing of the right to file a petition for writ of certiorari from an adverse decision of this Court.  Counsel appointed under the Criminal Justice Act must file their vouchers within 60 days of entry of judgment, denial of a petition for rehearing, or the grant or denial of a petition for writ of certiorari, whichever is later.

## PETITION FOR WRIT OF CERTIORARI  (Sup.Ct.R. 13)

Filing Time    Review on writ of certiorari is not a matter of right, but of judicial discretion, and will be granted only for compelling reasons.  The petition must be filed in the United States Supreme Court within 90 days of this Court's entry of judgment.

The time does not run from the issuance of the mandate.  If a petition for rehearing is timely filed, the time runs from the denial of that petition.  Content, fees, and number of copies of a petition for writ of certiorari are governed by the Rules of the United States Supreme Court.

JUDGMENT

FILED: March 24, 2006

UNITED STATES COURT OF APPEALS

for the

Fourth Circuit


No. 05-10
CR-98-47
CA-03-356-2


UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

RICHARD THOMAS STITT, a/k/a Patrick V. Hardy, a/k/a Tom Tom

Defendant - Appellant


No. 05-11
CR-98-47
CA-03-356-2


UNITED STATES OF AMERICA

Plaintiff - Appellant

v.

RICHARD THOMAS STITT, a/k/a Patrick V. Hardy, a/k/a Tom Tom

Defendant - Appellee


--------------------
Appeal from the United States District Court for the
Eastern District of Virginia at Norfolk
--------------------

In accordance with the written opinion of this Court filed
this day, the Court affirms the judgment of the District Court.
These cases are remanded to the District Court for further
proceedings consistent with the Court's opinion.

A certified copy of this judgment will be provided to the District Court upon issuance of the mandate.  The judgment will take effect upon issuance of the mandate.


/s/ Patricia S. Connor
_____
CLERK

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
                  *Plaintiff-Appellee,*

v.

RICHARD THOMAS STITT, a/k/a Patrick
V. Hardy, a/k/a Tom Tom,
                  *Defendant-Appellant.*

No. 05-10

UNITED STATES OF AMERICA,
                  *Plaintiff-Appellant,*

v.

RICHARD THOMAS STITT, a/k/a Patrick
V. Hardy, a/k/a Tom Tom,
                  *Defendant-Appellee.*

No. 05-11

Appeals from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Raymond A. Jackson, District Judge.
(CR-98-47; CA-03-356-2)

Argued: January 31, 2006

Decided: March 24, 2006

Before WIDENER, WILLIAMS, and MOTZ, Circuit Judges.

---

Affirmed and remanded by published opinion. Judge Motz wrote the
opinion, in which Judge Widener and Judge Williams joined.

---

2                       UNITED STATES V. STITT

## COUNSEL

**COUNSEL**: Amy Leigh Austin, Assistant Federal Public Defender, Gerald Thomas Zerkin, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Richmond, Virginia, for Richard Thomas Stitt. Thomas Ernest Booth, UNITED STATES DEPARTMENT OF JUSTICE, Criminal Division, Washington, D.C., for the United States. **ON BRIEF:** Frank W. Dunham, Jr., Federal Public Defender, Alexandria, Virginia; Jeffrey L. Stredler, WILLIAMS MULLEN, Norfolk, Virginia, for Richard Thomas Stitt. Paul J. McNulty, United States Attorney, Howard J. Zlotnik, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for the United States.

---

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

After Richard Thomas Stitt had exhausted all appeals of his convictions and sentence for three capital murders, he filed this petition for habeas relief. The district court denied Stitt's challenges to his conviction. The court concluded, however, that Stitt's counsel labored under an actual conflict of interest that adversely affected his representation of Stitt during the *penalty* phase of Stitt's trial. For this reason the district court vacated Stitt's sentence. The Government appeals that ruling. We also granted Stitt a certificate of appealability on the question of whether an actual conflict of interest adversely affected counsel's representation during the *guilt* phase. For the reasons that follow, we affirm the district court in all respects.

I.

In 1998, a jury convicted Stitt of three counts of murder during a continuing criminal enterprise and numerous federal drug and firearms offenses. Following a penalty phase hearing, the jury found the required statutory aggravating factors and unanimously voted to impose the death penalty for the three murder counts. We affirmed Stitt's convictions and capital sentence, and the Supreme Court

denied his petition for certiorari. *See United States v. Stitt*, 250 F.3d 878, 900 (4th Cir. 2001), *cert. denied*, 535 U.S. 1074 (2002).

Stitt then sought habeas relief pursuant to 28 U.S.C. § 2255 (2000). He filed numerous affidavits in support of this petition. After holding two evidentiary hearings, the district court rejected all of Stitt's habeas claims save one. The court concluded that Stitt's lead trial counsel, Norman Malinski, labored under an actual conflict of interest that adversely affected his representation of Stitt during the penalty phase of Stitt's trial. *See Stitt v. United States*, 369 F. Supp. 2d 679, 695 (E.D. Va. 2005). Specifically, the court found that Malinski, in order to protect his personal interests, failed to ask the court to appoint an expert qualified to testify about Stitt's propensity for future dangerousness, a request that the court likely would have granted; instead Malinski hired a less costly but much weaker "expert" whose only knowledge of federal prisons came from viewing a television program. *Id.* For this reason, the court vacated Stitt's sentence.

In reaching this conclusion, the district judge, who had also presided at Stitt's trial, relied not only on his own recollection of the trial and assessment of Malinski, but also on the many affidavits submitted by Stitt and the habeas testimony of several witnesses, including Malinski. The district judge made extensive factual findings in support of its conclusion, which the Government does *not* contend are in any way erroneous. We summarize these findings below.

The court initially noted that Stitt hired Malinski, a Florida lawyer who had represented Stitt in the past, as his principal counsel. Franklin Swartz, a Virginia lawyer, served as local counsel. *Id.* at 683. The court found that it was "not clear from the record exactly what were the sources of funds used to pay for [Stitt's] defense," nor even the precise amount of the fees paid. *Id.* at 691. During the course of Stitt's trial the prosecutor maintained that Malinski had received $500,000 in drug money to represent Stitt. *Id.* The district court conducted a short hearing on the matter *in camera* but did not pursue the matter further at trial. *See id.*

At the habeas hearings, however, in assessing Stitt's challenges, the court attempted to determine the particulars of Malinski's fee arrangement, including the source and amount of Malinski's fees. Malinski

4                     UNITED STATES v. STITT

testified that he had little recall of these matters. He was only clear that he and Swartz were to receive flat fees, with any costs for experts to be paid by Stitt's family "when a particular expense arose." *Id.* at 692. After repeated questioning by the court, Malinski guessed that he received a total flat fee of between $75,000 and $100,000. *Id.* at 691. Kenneth "Boobie" Williams stated in a sworn affidavit that he paid Malinski over $100,000 through third parties to represent Stitt. *Id.* Similarly, Maurica Stitt Johnson, Stitt's aunt, testified that she was an intermediary who collected money for Malinski from another friend of Stitt's in Florida, Robin Jones. *Id.* Notwithstanding this evidence, Malinski insisted that he did not remember anything more about his fees; specifically, he did not "recall who paid him" on Stitt's behalf or whether Stitt's family had been the only ones who had made the payments. *Id.* at 692. He did acknowledge that "one payment had to be rejected because the source of funds could not be verified." *Id.* Noting that "Malinski could not even tell the court whether he maintained any records as to what he was paid or what his expenses were," the district court expressly found Malinski "evasive and not credible in answering questions about the source of the funds, his expenditures and his record-keeping." *Id.*

Stitt argued that the Government's accusation that Malinski received over $500,000 in drug money made Malinski eager to avoid scrutiny of his fee. Requesting a court-appointed expert would have required the court to inquire into Stitt's resources and Malinski's fee; Stitt contended that Malinski's desire to protect his personal interests prevented him from seeking the court's assistance to hire a qualified expert. The district court found that "[i]t [wa]s clear that Malinski sought to avoid a Court inquiry into the source of funds paid to him in order to protect his own self-interest." *Id.* at 693. The court noted that Malinski himself conceded as much when cross-examined at the habeas hearing. Malinski testified that he believed Stitt "didn't have the resources to pay for [a] mitigation investigator" to assist during the penalty phase, and admitted that he knew that "under the law . . . Stitt was entitled to the provision of such services." Yet despite this knowledge, Malinski refused to ask the court to appoint an adequate mitigation expert, or even to recommend this course of action to Stitt. *Id.* at 693. Indeed, Malinski acknowledged that he "never discussed this option with [Stitt]," nor did he inform Stitt "of Malinski's decision not to pursue it." *Id.* at 694. Malinski testified that he did not

seek a court-appointed expert because such a request could have "caused problems" by requiring Malinski to divulge the amount and sources of his fees. Malinski "didn't want to go down that road"; according to Malinski, it was a "hot spot" because of the prosecution's allegation that Malinski had been paid $500,000 in drug money to represent Stitt. *Id.* at 693. The district court pointed out that it had attempted to have Malinski elaborate on the "problems" that "he believed would have been caused" by the court's appointment of an adequate propensity for violence expert, but Malinski "c[ould] not — or w[ould] not" articulate any asserted problems other than to acknowledge that he sought to avoid "the Government's inquiry into the source of payments made to him." *Id.* at 694. For these reasons the court found it "obvious that Malinski labored under an actual conflict of interest." *Id.*

The court concluded that this actual conflict had an adverse effect on Stitt's defense because an adequate expert addressing Stitt's propensity for violence was critical to counter the Government's expected position that Stitt would present a danger if sentenced to life imprisonment. (The Government did in fact present a strong expert on Stitt's future dangerousness in prison, and the jury unanimously found that Stitt's future dangerousness was an aggravating factor justifying imposition of the death penalty.) Malinski located and sought to hire Dr. Mark Cunningham, a recognized propensity for violence expert with extensive experience in federal capital cases. When Stitt's family did not have sufficient funds to hire Dr. Cunningham, Malinski instead hired the concededly less expensive and less qualified Dr. Thomas Pasquale. The district court found that "[t]here is no doubt that Dr. Cunningham would have been the stronger expert," noting that Dr. Pasquale's only exposure to federal prisons was viewing an HBO television special. *Id.* at 695 & n.11. The court found that Malinski based his decision to hire Dr. Pasquale solely on protecting his financial arrangements from the court's scrutiny, and concluded that "[t]his was not a reasonable basis for the decision, because the circumstances suggest that Malinski could have obtained court-appointed experts." *Id.* at 695. For these reasons, the court found that Malinski's actual conflict of interest "adversely affected" Stitt's defense, and so "prejudice . . . is presumed." *Id.*

The district court denied all of Stitt's other habeas claims, including Stitt's contention that Malinski "failed to conduct adequate inves-

6                          UNITED STATES v. STITT

tigations or to hire appropriate experts" during the guilt phase of the trial "because these were expenses that would have been paid from the retainer given to Malinski, and Malinski wanted to keep the money." *Id.* at 692. The court noted that Stitt offered no retainer agreement or affidavit that contradicted Malinski's testimony that he and Swartz were guaranteed flat fees for their services and that expert fees and other costs were not to be deducted from those flat fees. *Id.*

The Government appeals the district court's judgment vacating Stitt's sentence, and we granted Stitt a certificate of appealability (COA) on his claim that Malinski's conflict of interest denied him effective assistance of counsel during the guilt phase.[1] We first consider the Government's appeal, and then turn to Stitt's challenge.

                                   II.

In order to show ineffective assistance of counsel, a claimant generally must demonstrate that his lawyer afforded him defective representation and that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). However, when counsel is burdened by an actual conflict of interest, he "breaches the duty of loyalty, perhaps the most basic of counsel's duties." *Id.* at 692. In this situation, a defendant need not show prejudice due to the inherent seriousness of the breach and the

---

[1]After Stitt filed his reply brief, we granted an additional COA to allow Stitt to present two alternative grounds for affirming the district court's decision to vacate his sentence. In the absence of this additional COA, we would not have jurisdiction to consider alternative grounds for affirming a district court's grant of relief when the district court denied relief on those grounds below. *See Manokey v. Waters*, 390 F.3d 767, 773-74 (4th Cir. 2004). We asked the parties to brief the question of whether the Fourth Circuit's Local Rule 22(a) permits the expansion of a COA when the court of appeals granted the COA in the first instance. Both parties contend that the Local Rules do not prohibit this; we agree that it is neither expressly permitted nor prohibited by the Local Rules. However, because we affirm on the basis relied on by the district court, we need not reach Stitt's alternative grounds for affirmance, nor do we need to resolve whether in this particular case we acted improvidently in expanding the COA.

difficulty in "measur[ing] the precise effect on the defense of repre-
sentation corrupted by conflicting interests." *Id.* Rather, "[p]rejudice
is presumed . . . if the defendant demonstrates that counsel actively
represented conflicting interests and that an actual conflict of interest
adversely affected his lawyer's performance." *Strickland*, 466 U.S. at
692 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980)) (internal
quotation marks omitted).

The district court analyzed Stitt's conflict of interest claims under
the presumption of prejudice standard first set forth in *Sullivan*. The
Government's appeal turns on whether the court erred in doing so.
This is because the *sole* ground urged by the Government for reversal
is that the district court applied the wrong legal standard. Thus, the
Government does not challenge "the district court's conclusion that
Malinski had a private conflict of interest or that the conflict
adversely affected his performance." Brief of Appellee at 19. Indeed,
the Government concedes that if *Sullivan* is the correct standard, Stitt
produced sufficient evidence to obtain relief from his capital sentence.

The Government insists, however, that the *Sullivan* standard does
not apply to the actual conflict here but only to conflicts growing out
of multiple representation claims — those involving a lawyer's repre-
sentation of two or more clients at the same time. According to the
Government, all non-multiple representation conflict of interest
claims must meet the *Strickland* prejudice requirement. The Supreme
Court has never so held, and we have repeatedly rejected this
approach. *See, e.g.*, *Rubin v. Gee*, 292 F.3d 396, 402 n.2 (4th Cir.
2002); *United States v. Magini*, 973 F.2d 261, 264 (4th Cir. 1992);
*United States v. Tatum*, 943 F.2d 370, 376 (4th Cir. 1991).

Of course, we have also repeatedly reiterated that in order to obtain
the benefit of the *Sullivan* presumption a defendant must demonstrate:
(1) an actual conflict of interest (2) that "result[s] in an *adverse effect*
on counsel's performance." *Tatum*, 943 F.2d at 375. Although this
standard excuses a petitioner from proving prejudice under *Strick-
land*, it does not lack teeth.

First, the conflict of interest must be active; possible or potential
conflicts will not satisfy this requirement. *See, e.g.*, *Burger v. Kemp*,
483 U.S. 776, 783 (1987) (holding that possible conflict of interest

arising out of attorney's participation in co-defendant's trial "did not so infect [petitioner's] representation as to constitute an active representation of competing interests"); *United States v. Burns*, 990 F.2d 1426, 1438 (4th Cir. 1993) (finding that defendant's state bar grievance petition against his lawyer did not create an actual conflict because the attorney could not "have gleaned any advantage for himself in disciplinary proceedings before the state bar by failing to employ his best exertions . . . at trial").

Moreover, even if a petitioner can establish the first element — an actual conflict of interest — he will not be entitled to the *Sullivan* prejudice presumption unless he can also demonstrate the second element — that "the conflict has significantly affected counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 173 (2002). To establish that an actual conflict caused an adverse effect, a defendant must meet a three-part test. As Judge Widener explained for this court sitting *en banc*:

> First, the petitioner must identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued. Second, the petitioner must show that the alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision. . . . Finally, the petitioner must establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict.

*Mickens v. Taylor*, 240 F.3d 348, 361 (4th Cir. 2001) (en banc), *aff'd*, 535 U.S. 162 (2002). Thus, it is not enough for a petitioner to show that his attorney labored under an actual conflict; he must also demonstrate that the conflict caused the attorney's failure to pursue a plausible, objectively reasonable alternative strategy.

But when a petitioner can establish these two elements, we have concluded on multiple occasions that the *Sullivan* presumption applies, even when counsel is *not* simultaneously representing two or more persons. For example, in *Tatum* we pointed out that an actual conflict does not necessarily require that an attorney "*formally* represent[ ] hostile interests." *Tatum*, 943 F.2d at 376 (emphasis added). Rather, we noted that an attorney will labor under an actual conflict

of interest sufficient to trigger the *Sullivan* presumption when he "harbor[s] substantial personal interests which conflict with the clear objective of his representation of the client." *Id.*

In *Magini*, we again expressly rejected the Government's argument here, holding that "although conflicts of interest usually occur when an attorney represents multiple clients, a conflict may also arise between an attorney's private interests and those of the client." *Magini*, 973 F.2d at 264 (citations omitted). There, a habeas petitioner claimed that her counsel's private pecuniary conflict of interest violated her Sixth Amendment right to counsel. The district court analyzed her claim as one of "attorney competence" under *Strickland*. *Id.* at 264. We reversed, holding that *Sullivan* provided the correct method of analysis, and remanded for an evidentiary hearing "to analyze her conflict of interest claim according to the [*Sullivan*] standard." *Id.* at 265.

Finally, just a few years ago, we once again rejected the Government's position here. In *Rubin*, we held that *Sullivan* constituted the clearly established federal law governing a petitioner's claim that her lawyers' private conflict of interest adversely affected her representation. *Rubin*, 292 F.3d at 402. The conflict of interest in *Rubin* arose from the fact that, shortly after the petitioner shot her husband, two of her five lawyers arrived at the scene of the crime, took possession of evidence, and instructed her to check into a hospital using an alias. *Id.* at 403. We found that these lawyers' *personal* interests in avoiding prosecution and securing a retainer fee created an actual conflict that adversely affected the petitioner's representation. *Id.* at 401-02.

Despite our uniform precedent,[2] the Government insists that

---

[2]Contrary to the Government's contention, Reply Brief of Appellee at 3, 6, our precedent on this question is indeed "uniform," and neither *Burns* nor *Vinson* adopt a contrary rule. Rather, in both cases we cited *Sullivan* as the standard for determining the asserted conflict of interest claim but concluded that the defendant could not meet the *Sullivan* standard, *i.e.*, could not demonstrate an actual conflict of interest that adversely affected his lawyer's performance. *See Vinson v. True*, 436 F.3d 412, 418 (4th Cir. 2006) (holding that Vinson's lawyers did not have an actual conflict with him, but only an "*independent and unrelated conflict between themselves*"); *Burns*, 990 F.2d at 1438 (holding Burns's lawyer did not have an actual conflict of interest that adversely affected his representation).

"[a]fter *Mickens*, it is untenable to apply *Sullivan* to a private conflict of interest case." Reply Brief of Appellee at 6. Contrary to the Government's suggestion, *Mickens* does not state, let alone hold, that *Sullivan* does not apply to private conflict of interest cases. Rather, the *Mickens* Court specifically left the scope of *Sullivan* "open." *Mickens*, 535 U.S. at 176. Moreover, *after Mickens* issued, we expressly held in *Rubin* that the *Sullivan* standard *does* apply to cases involving private conflicts of interest. *Rubin*, 292 F.3d at 402 n.2; *see also Vinson v. True*, 436 F.3d 412, 418 (4th Cir. 2006) (applying *Sullivan* even when there was no multiple representation). Although we noted in *Rubin* that in *Mickens* the Supreme Court had warned against unduly expanding *Sullivan* to cover "every potential conflict of interest," we concluded that the Court "has never indicated that *Sullivan* would not apply to a conflict as severe as the one presented here." *Rubin*, 292 F.3d at 402 n.2. The Government does not contend that the conflict of interest in this case is less severe than the one presented in *Rubin*. Nor could it, given the evidence presented in this case.[3]

Accordingly, we again reject the Government's contention that *Sullivan* only applies to conflicts involving multiple representation. The district court did not err in holding that *Sullivan* provided the appropriate framework for analyzing the private conflict of interest claims at issue here.

Nor did the district court err in its application of the *Sullivan* standard to Stitt's penalty phase claim. As outlined above, the district court first found that Malinski's desire to shield his fee arrangement from the court's scrutiny constituted an actual, not possible or potential, conflict of interest because Malinski's personal interests prevented him from asking the court to appoint a qualified mitigation

---

[3]The conflict of interest in *Rubin* and in the case at hand are very similar. In both the defendant's lawyers put their own interests — *i.e.* their financial interests and their interest in avoiding possible criminal prosecution — above their clients' interests. Here, however, the adverse effect of the actual conflict on the defense is even more obvious than it was in *Rubin*. The Government's ready concession that Malinski's actual conflict of interest adversely affected Stitt's representation highlights the severity of the conflict in this case, in sharp contrast to the vigorous dispute of that question in *Rubin*. *Compare Rubin*, 292 F.3d at 404-06.

expert. Then the court concluded that asking the court to appoint Dr. Cunningham, a qualified expert, was a plausible, objectively reasonable strategy. *See Mickens*, 240 F.3d at 361. Malinski knew of this strategy, and the request for court resources likely would have succeeded, but Malinski did not pursue it because of his conflict of interest — he placed his desire to protect his fee from scrutiny ahead of his duty to Stitt. *Stitt*, 369 F. Supp. 2d at 694-95. Thus, the district court found that Stitt offered evidence of an actual conflict that adversely affected Malinski's performance and therefore satisfied both elements of the *Sullivan* test. The Government does not dispute these findings, nor can we conclude that they are clearly erroneous. Therefore, we affirm the district court's judgment vacating Stitt's sentence.

III.

Finally, we turn to the issue on which we granted a COA — Stitt's claim that Malinski labored under a conflict of interest that adversely affected his representation during the guilt phase. The district court rejected this claim, finding that Stitt could not demonstrate that Malinski had an actual conflict of interest. *See Stitt*, 369 F. Supp. 2d at 692.

As discussed above, if Stitt can show an actual conflict of interest that adversely affected his representation, he qualifies for *Sullivan*'s presumption of prejudice. *See Sullivan*, 446 U.S. at 348-49; *Rubin*, 292 F.3d at 401-02. Stitt asserts that Malinski's fee arrangement led Malinski to refrain from conducting an out-of-state investigation during the guilt phase since the costs of such an investigation would have come out of Malinski's fee. In addition, Stitt argues that the district court's finding of no actual conflict of interest during the guilt phase contradicts the court's statement that, "[o]verall, the Court finds that Malinski was evasive and not credible in answering questions about the source of the funds, his expenditures and his record-keeping." *Stitt*, 369 F. Supp. 2d at 692. We cannot agree.

The district court concluded that there was no conflict of interest during the guilt phase because "there is no indication that the money Malinski received for his representation was directly correlated to money that would be paid for experts or other fees and costs." *Stitt*,

369 F. Supp. 2d at 692. The court thus appears to have credited Malinski's testimony that he was to be paid a flat fee, with Stitt's family and friends providing additional funds for expenses as those costs arose during the trial. This finding does not contradict the district court's further finding that Malinski was not credible in some respects; it simply evidences that the district court found Malinski credible as to some issues, but not others. Although the district court generally found Malinski not credible, it concluded that it could not reject his guilt phase denial given that Stitt offered no contract or affidavit contradicting Malinski's testimony as to the flat fee aspect of the fee arrangement. We cannot conclude that the district court's finding of no conflict during the guilt phase is clearly erroneous.

Furthermore, even if Stitt could establish an actual conflict of interest during the guilt phase, he clearly failed to demonstrate that the conflict adversely affected his representation during that phase. Stitt asserts that he need only show that Malinski failed to pursue a plausible alternative strategy. This argument ignores our holding in *Mickens*, which emphasized that the plausible alternative strategy must be "objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision." *Mickens*, 240 F.3d at 361.

In contrast to his showing regarding the penalty phase, Stitt failed to meet the *Mickens* test for demonstrating adverse effect during the guilt phase. Specifically, Stitt has failed to demonstrate that conducting an out-of-state investigation was a plausible, objectively reasonable strategy based on the facts known to Malinski at the time of trial. *See id.* Although the indictment indicated that the conspiracy operated in both Virginia and North Carolina, the majority of the offenses charged — including the three murders — took place in Virginia. Nothing in the record suggests that an out-of-state investigation would in any way have aided Stitt's defense. Therefore, Stitt cannot meet the second prong of the *Mickens* adverse effect test. The district court did not err in rejecting Stitt's claim of ineffective assistance of counsel during the guilt phase.[4]

---

[4]Stitt conceded at oral argument that he cannot prove *Strickland* prejudice as a result of Malinski's representation during the guilt phase. Because we reject his conflict of interest argument, Stitt's claim of ineffective assistance of counsel during the guilt phase must fail.

IV.

For the foregoing reasons, we affirm the judgment of the district court and remand the case for re-sentencing.

*AFFIRMED AND REMANDED*